**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LINDA KRULL,

                            CASE NO. 16-10575

        *Plaintiff*,           DISTRICT JUDGE MARIANNE O. BATTANI

*v.*                        MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Krull is not disabled. Accordingly, **IT IS RECOMMENDED** that Krull's Motion for Summary Judgment (Doc. 14) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*., Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act 42 U.S.C. § 401 *et seq.*, and a period of disability (Doc. 4; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 16).

Plaintiff Linda Krull was fifty-one years old as of October 26, 2015, the date of the ALJ's decision. (Tr. 26, 189). Her application for benefits was initially denied on March 18, 2014. (Tr. 98-99). Krull requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Mark Kim on September 9, 2015. (Tr. 34-64). Krull, represented by attorney Justin Drilich, testified, as did vocational expert ("VE") Susan Rowe. (*Id.*). On October 21, 2015, the ALJ issued a written decision in which she found Krull not disabled. (Tr. 13-26). On December 30, 2015, the Appeals Council denied review. (Tr. 1-4). Krull filed for judicial review of that final decision on February 16, 2016. (Doc. 1).

**B.      Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

3

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least

4

18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Krull not disabled under the Act. (Tr. 26). The ALJ found at Step One that Krull had not engaged in substantial gainful activity following the alleged onset date, October 20, 2011. (Tr. 15). At Step Two, the ALJ concluded that Krull had the following severe impairments: "porcelain gallbladder; degenerative disc disease – lumbar and cervical; arthropathy, right shoulder; cataracts, both eyes, right greater than left; chronic obstructive pulmonary disease (COPD); asthma; cirrhosis; alcoholism; post traumatic stress disorder (PTSD); major depression; panic disorder; generalized anxiety disorder . . . ." (Tr. 15-16). At Step Three, the ALJ found that Krull's combination of impairments did not meet or equal one of the listed impairments. (Tr. 16). The ALJ then found that Krull had the residual functional capacity ("RFC") to perform light work, except with the following additional limitations:

> She can occasionally perform push and pull operation [sic] with the dominant right upper extremity. She must be allowed to alternate from sit and stand position every 20 minutes. She can never climb ladders, ropes or scaffolds; never kneel, crouch or crawl; can occasionally climb ramps and flights of stairs, and stoop; and frequently balance. She can occasionally flex and extend the neck. She must never reach behind with the dominant right upper extremity. she would be limited to occupations requiring only occasional

5

vision with the right eye – near acuity, far acuity, peripheral vision; and only occasionally peripheral vision with the left eye. She must avoid all exposure to extreme cold, humidity, and excessive vibration. She must avoid all exposure to irritants such as fumes, dust, and chemicals as well as poorly ventilated areas. She also must avoid all exposure to hazards such as moving machinery and unprotected heights. She must avoid commercial driving. Work would be limited to simple, routine, and repetitive tasks with only occasional interaction with the public and coworkers.

(Tr. 18-24). At Step Four, the ALJ found that Krull could not return to any past relevant work. (Tr. 25). At Step Five, the ALJ concluded that Krull retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 25-26).

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has thoroughly reviewed Krull's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.   Application Reports and Administrative Hearing

##### a.   Krull's Function Report

Krull completed a function report on December 30, 2013. (Tr. 248). Therein, she wrote that she was unable to work because she had "a hard time reading or driving," because her "balance is off due to vision problems," she was "always tired, fatigued, [had] mood swings, pain, [was] depressed," and had "shoulder & back" problems which "limit

6

lifting and yardwork. (*Id*.). Her average day consisted of washing dishes, watching television, "mess[ing] with cats," and attempting to "clean up around the place." (Tr. 249). She was responsible for taking care of and feeding her cats, but her housemate took over that duty when she was unable. (*Id*.). Prior to suffering from her illnesses, Krull was able to read and "take care of yard maintenance." (*Id*.). She felt restless because "pain wakes [her] up, worry keeps [her] up," and she found herself tossing and turning without finding a comfortable position. (*Id*.). In terms of personal care activities, Krull reported no problems whatsoever. (*Id*.). She required no reminders to take medication or perform personal care. (Tr. 250).

Krull prepared "quick easy meals" on a daily basis, which took her thirty minutes to three hours. (Tr. 250). However, she cooked less often and made less complex meals due to her illnesses. (*Id*.). As to chores, she did the laundry and "some cleaning," washed dishes, and cooked. (*Id*.). She needed encouragement to complete these tasks because she "just can't seem to get the energy," and because it did not "seem worth the bother" to complete these tasks. (*Id*.).

Krull went outside daily, and could go out alone. (Tr. 251). She was able to drive, but did so "very little because of vision." (*Id*.). She shopped in stores monthly for about two hours at a time. (*Id*.). She reported not going anywhere on a regular basis. (Tr. 252).

Krull could handle money without issues, but (apparently confusing mental capacity for financial capacity) wrote that she could not "pay bills" because she has "no income." (Tr. 251). Her illnesses did not affect her ability to handle money. (Tr. 252).

7

Krull's hobbies included reading, but she did so "not often." (Tr. 252).

Krull "visit[ed]" with others a few times per week, and would "have a few cocktails." (Tr. 252). She drank six days per week. (*Id*.). She reported difficulty with "mood swings," and was "less social and rarely [went] anywhere." (Tr. 253).

Krull checked boxes indicating that her ailments limited her ability to perform all postural and exertional tasks with the exception of stair climbing and using her hands. (Tr. 253). She also checked boxes indicating that she suffered limited concentration, had problems completing tasks, and getting along with others. (*Id*.). Krull wrote that on some days she had "little problem," but on other days when she felt "stiff," she was "very uncomfortable." (*Id*.).

Krull could walk one block without stopping, and could return to walking after a "couple minutes." (Tr. 253). Her ability to pay attention to a task "depend[ed] on [her] interest." (*Id*.). However, she could follow written instructions "pretty well," and was "good" with verbal instructions. (*Id*.). She got along with authority figures "quite well." (Tr. 254). She did not fill out portions of the function report relating to stress and changes in routine. (*Id*.).

Krull also reported side effects of medication including dizziness and lightheadedness. (Tr. 255).

In a remarks section, Krull wrote that she "can not keep weight on," and that she "only weigh[ed] 142 [pounds] and am 6ft tall." (Tr. 255). She complained of stress from "not being able to get further tests and treatments," which caused her to be "depressed

8

scared and unable to function at a better level." (*Id*.). She began "drinking heavily compared to normal." (*Id*.). She reported being withdrawn, unsociable, and listless. (*Id*.). She "sometimes wish[ed] it was over." (*Id*.).

### b.     Third-Party Function Report

On December 30, 2013, Krull's friend Phyllis Withey filled out a third-party function report which generally corroborated Krull's own function report. (Tr. 237-44). She noted that she visited with Krull for about an hour on "most days." (Tr. 237). Withey also asserted that Krull's pain "prevent[ed] her from standing for any length of time and cancer of gallbladder causes her stomach problems. (*Id*.). She also wrote that Krull visited with neighbors at their homes three to four times weekly. (Tr. 241). Krull was unable to lift ten pounds without pain. (Tr. 242). She wrote that Krull had no problems with paying attention, and could follow instructions "very well." (*Id*.).

### c.     Krull's Testimony at the Administrative Hearing

At the September 9, 2015, hearing the ALJ asked numerous questions regarding Krull's past work. However, because the ALJ did not conclude that Krull was capable of returning to any past relevant work, these questions have little significance to this appeal, and need not be considered. (Tr. 40-43).

Krull testified that her neck pain symptoms were both painful and restrictive, and gave her difficulty looking both up and down. (Tr. 44). Her back pain sometimes limited

9

her ability to walk and bend, and "[v]ery much" limited her ability to lift, which restricted her ability to do housework. (*Id.*). She suffered some pain while sitting, and could stand for "about ten minutes," such that she was unable to "get [her] mail or walk [her] dog." (Tr. 45). She found it necessary to "put bars in [her] shower" after falling. (Tr. 45, 53).

Krull asserted that her shoulder pain prevented her from lifting her right arm fully above her head, or reaching behind herself with either arm. (Tr. 46-47).

As to her eyes, Krull testified that she had surgical implantations in both eyes in August 2014. (Tr. 47). Prior to that surgery, she was unable to see sufficiently well to drive, and would sometimes trip over unseen objects. (*Id.*). Following the surgery, Krull could see sufficiently well that she required glasses only "basically for reading." (*Id.*).

Krull asserted that her emphysema was so severe that she used inhalers as "often as they allow it." (Tr. 48).

She dealt with depression "every day," and alleged that she also experienced anxiety, panic, and post-traumatic stress disorder. (Tr. 49). These conditions resulted, in part, from her "son almost kill[ing]" her. (*Id.*). She disliked being around the public and coworkers. (*Id.*). However, she had begun receiving mental health treatment only the day before the hearing. (*Id.*). She spoke of sometimes yelling at others. (Tr. 57). Krull also complained of limited concentration, such that she forgot details and appointments unless written down. (*Id.*).

Krull further noted that she had her gallbladder removed to treat swelling in her lower extremities, but that the removal of that organ did not resolve that issue, and instead

10

caused further swelling. (Tr. 50). She was twice admitted to the hospital to drain her abdomen of fluid. (Tr. 51).

Krull alleged that her neck pain rated at about a two out of ten after taking pain medication, and that her back pain was about a four or five out of ten when treated with medication. (Tr. 51).

Her back pain traveled into her legs roughly once weekly, and could be triggered by something as simple as picking a bowl up from a table. (Tr. 51-52). She described her leg pain as a "tingling, burning" sensation. (Tr. 52). Her most comfortable position was lying down, and found it necessary to lie "on the floor" for "three to four hours" during the day to keep her back straight. (Tr. 52-53).

Krull stated that her conditions prevented her from mopping, slowed her vacuuming such that it took three hours to do a single room and hallway, and caused her to take breaks when performing other chores like cleaning the sink, washing dishes, making her bed, and showering. (Tr. 54).

Krull alleged that her conditions had generally remained the same or worsened slightly since 2011 (Tr. 54-55). She asserted that she was unable to kneel. (Tr. 55). Krull also asserted that she slept for up to sixteen hours daily, and had done so for about two months. (*Id*.). She felt rested upon waking. (Tr. 56).

Krull asserted that she no longer went shopping on her own, the result of recent falling spells due to balance issues and leg weakness. (Tr. 56).

Finally, Krull asserted that high humidity weather increased her pain. (Tr. 58).

### d.      The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Krull's ability to perform work. (Tr. 58). The ALJ asked several questions regarding Krull's past work, but these questions are not relevant as the ALJ found that Krull was unable to perform any past work, and thus based his unfavorable decision on Krull's ability to complete other work available in the national economy. (Tr. 59).

The ALJ asked the VE to assume a hypothetical individual with Krull's age, education, and work experience, and who could perform light work with the following additional limitations:

> Person can occasionally perform push and pull operation with the dominant right upper extremity; can never climb ladders, ropes or scaffolds, crouch or crawl; can occasionally climb ramps and flights of stairs; stoop and kneel; and frequently balance. Person must avoid repetitive flexion and extension of the neck. This person must never reach behind with the right dominant right upper extremity. Person would be limited to occupations requiring only occasional . . . peripheral vision with the left eye. Person must avoid even occasional exposure to extreme cold and humidity, as well as excessive vibration; must avoid all exposure to irritants such as fumes and dust and chemicals, as well as poorly ventilated areas; also must avoid all exposure to hazards such as moving machinery and unprotected heights. Person must avoid commercial driving. The work would be limited to simple, routine, repetitive tasks with only occasional interaction with the public and coworkers.

(Tr. 59-60). The VE found that such a person could not perform any of Krull's past work, but could work as a laundry sorter (40,000 jobs nationwide), cafeteria attendant (35,000 jobs), and an office helper (30,000 jobs). (Tr. 60-61).

12

The ALJ then posed a second hypothetical, wherein the worker would be limited as in the first hypothetical, but the person would also be "allowed to alternate from sit and stand position every 20 minutes; can never kneel. Person can only occasionally flex and extend the neck; must avoid all exposure to the extreme cold, humidity, and excessive vibration." (Tr. 61). The VE found that a so-limited individual would be able to perform work as a machine tender (18,000 jobs nationally), and in a limited range of office helper positions (15,000 jobs). (Tr. 61).

In a third hypothetical, the ALJ further limited the hypothetical worker to sedentary positions. (Tr. 61). The VE found that a so-limited individual could work as a parts polisher (20,000 jobs nationally) and machine tender (15,000 jobs). (*Id*.). The VE confirmed that a much larger range of positions would be available but for the hypothetical worker's ocular limitations. (Tr. 62).

In a fourth hypothetical, the ALJ returned the "light" level of exertion, and asked whether a worker limited as in the second hypothetical, and who would also miss three days of work per month due to mental health and physical health issues, and who would be off task for at least twenty percent of the workday, would be able to perform work available in substantial numbers in the national economy. (Tr. 62). The VE confirmed that these restrictions would preclude all competitive work. (*Id*.). The VE further found that workers may not be off task more than ten or twelve percent of the time in order to maintain competitive employment. (Tr. 62).

**F.     Governing Law**

13

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

14

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Krull v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

15

must contain specific reasons for the weight given to the treating
source's medical opinion, supported by the evidence in the case
record, and must be sufficiently specific to make clear to any
subsequent reviewers the weight the adjudicator gave to the treating
source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example,

an ALJ may properly reject a treating source opinion if it lacks supporting objective

evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich.

1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table

decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's

statements about pain or other symptoms with the rest of the relevant evidence in the record

and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding

a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health &

Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*,

No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Krull v. Halter*, 307

F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir.

2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186,

at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical

evidence of the underlying condition exists. The ALJ then determines whether that

condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's

17

work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Krull argues that the ALJ erred in several ways, each of which should merit remand. (Doc. 14 at 11-14). These arguments will be addressed in turn.

### 1.    The ALJ Properly Analyzed Krull's Leg and Hip Disorders

Krull first argues that the ALJ improperly discounted her "bilateral hip problems and peripheral neuropathy at step two without proper reasoning" by finding those impairments non-severe. (Doc. 14 at 11). Krull correctly notes that the ALJ had a duty to consider all severe and non-severe impairments in the remaining steps. *See McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008). Consequently, the ALJ's

18

decision to consider some impairments severe and others non-severe is "legally irrelevant." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (quotation omitted). Nevertheless, Krull argues that the ALJ failed to "evaluate or consider the impairment [sic]" in the balance of his opinion (Doc. 14 at 11).

A review of the ALJ's decision reveals that he considered Krull's hip and leg impairments, including her complaints of hip stiffness and pain, her limited ability to sit, walk, and stand, the allegation that she loses balance and experiences leg weakness, suffers from lower extremity swelling, and experiences relief from lying down (Tr. 19). Likewise, the ALJ noted findings that Krull's hip motion was full, that she suffered from no knee pain, swelling, or ankle pain, that her vibration sense was somewhat diminished in the left foot, and that her gait was unremarkable. (Tr. 20). He further found that Krull was not taking any prescription pain medication in 2014, and last filled her Norco pain-reliever prescription in January of 2012. (Tr. 20-21, 331, 420). He noted her complaint that she could sit for only about thirty minutes and walk for one quarter mile. (Tr. 21). He also noted the consultative examiner's findings that Krull could hop on and off the examination table without issue, had only mild difficulty performing heel-toe walking, mild difficulty squatting, and mild difficulty squatting, along with negative results on the straight leg raise test. (Tr. 21, 421-22). Her gait was well preserved, and a range of motion study produced nominal results, including a full range of motion in the cervical spine, knee, hip, and ankle. (Tr. 21, 422-23). He also noted findings from Krull's physicians that her gait and station were normal (Tr. 22, 322, 340), and that she had normal movement in all extremities (Tr.

19

22, 434). Further, the ALJ noted that Krull testified to a fairly normal range of daily activities, including performing chores like laundry, cleaning, washing dishes, cooking, caring for her cat, and shopping, and performing personal care. (Tr. 23, 248-52).

In short, the ALJ identified numerous reasons to believe that Krull lives a life largely unhindered by her leg ailments. Whatever lower extremity limitations Krull might suffer from are fully accommodated by the ALJ's RFC assessment, which includes a restriction to light work, a sit/stand option, a restriction to never climbing ladders, ropes, or scaffolds; never kneeling, crouching, or crawling; occasionally climbing ramps, stairs; occasionally stooping, only frequently balancing; avoiding all exposure to extreme cold, humidity, and vibration; avoiding all moving machinery and unprotected heights; and avoiding commercial driving. (Tr. 18).

Krull has not proposed any additional restrictions relating to her leg ailments which the ALJ should have included in the RFC, nor has she cited to any medical records which might suggest additional restrictions.

"It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)). Krull's failure to develop her argument in a more than "skeletal way," leaving it for the Court to "put flesh on its bones," merits waiver. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)); *see also Fielder v. Comm'r of Soc. Sec.*,

20

No. 13-10325, 2014 WL 1207865, at *1 (E.D. Mich. Mar. 24, 2014) (finding argument waived where "Plaintiff's summary judgment brief lacked any survey, much less meaningful discussion, of the medical record, and Plaintiff likewise failed to 'provide any factual basis' for his challenge to the ALJ's assessment of his credibility").

Review of Krull's medical records reveals no evidence of functional limitation beyond that accounted for in the ALJ's RFC finding. In 2011 Krull experienced significant back and pelvic pain after falling off of a roof. (Tr. 348). In 2012 Krull reported "radiating pain from her lower back into her hips and down both legs, and her feet feel like they are 'ice.'" (Tr. 302). In 2013 she experienced swelling of the legs. (Tr. 381). In 2011 a radiological scan revealed no pelvic abnormalities. (Tr. 311). In 2014 Krull was able to perform all tested postural and exertional abilities, including standing, bending, stooping, getting on and off the exam table, putting her heel to her shin, and climbing stairs, and had normal reflexes throughout, but showed "mild diff[iculty]" with walking on heels and toes, squatting, and hopping, and an illegible notation (possibly "guarded") was made regarding her gait. (Tr. 418-19). In 2014, an MRI of the lumbar spine showed "[v]ery mild spinal canal stenosis," along with some foraminal narrowing and/or stenosis. (Tr. 556, 596). Likewise, a 2014 scan of her thoracic spine showed no abnormality. (Tr. 595).

In sum, while Krull doubtless suffered from some leg and hip pain at times, the record does not demonstrate ongoing limitations to her legs or hips which would merit greater restrictions than proposed by the ALJ in his RFC finding.

### 2.  The ALJ Properly Evaluated Whether Krull Met a Listing

Krull next argues that the ALJ did not appropriately consider whether she met a listing, and in particular failed to consider Listing 1.02, which addresses major dysfunction of a joint. (Doc. 14 at 11). A claimant meets Listing 1.02 where they suffer from an impairment:

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Pt. 404. Subpt. P, App. 1 § 1.02.

It is the claimant's burden to show that she meets or medically equals an impairment in the listings. *See Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). A claimant's failure to specifically detail, in a point-by-point fashion, how he or she meets a listing waives that argument. *See Mortzfield v. Comm'r of Soc. Sec.*, No. 12-15270, 2014 WL 1304991, at *14 (E.D. Mich. Mar. 31, 2014) ("Plaintiff bears the burden of establishing that he meets a particular listing and plaintiff's argument in this regard is not sufficiently developed such that the undersigned can make such a determination. Plaintiff cannot simply make the

22

bald claims that the ALJ erred, while leaving it to the Court to scour the record to support this claim.").

> Krull asserts that she meets listing 1.02 because she
>
> has considerable problems with her right shoulder injury. X-ray of the right shoulder demonstrates that Plaintiff suffered severe injury to her right shoulder including the right acromioclavicular separation. (R. 12-7, T.r. 305-07). Plaintiff has significantly decreased range of motion in her right shoulder. *Id*. It is unclear from the decision how this limits the Plaintiff and incorporated in the decision since it is never discussed by the ALJ.

(Doc. 14 at 12).

Assuming for the sake of argument that Krull has identified a "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint," with "joint space narrowing, bony destruction, or ankylosis," she has not even attempted to demonstrate that she meets either subsection of Listing 1.02. Because Krull asserts that her right shoulder ailment meets Listing 1.02, and because subsection A deals exclusively with a "major peripheral weight bearing joint (i.e. hip, knee, or ankle)," she must believe that she meets subsection B. Yet subsection B requires that the claimant demonstrate "[i]nvolvement of one major peripheral joint in each upper extremity . . . resulting in an inability to perform fine and gross motor movements effectively." Krull's brief does not even suggest that she experiences any limitation to the upper left extremity (in addition to the upper right extremity), nor does she suggest that she is unable to perform fine or gross motor movements effectively. This failure to specifically detail, in a point-by-point fashion, how she meets Listing 1.02(B)

23

waives that argument. Krull is not entitled to rely upon the Court to scour the record for evidence which might support a finding that she meets Listing 1.02.

In any case, state agency physician Dr. Robert Newhouse reviewed Krull's medical record, and found that she did not meet or equal Listings 1.04, 3.02, 3.03, 12.04, or 12.06 (Tr. 73), and the ALJ properly relied upon that finding in his decision (Tr. 16-18). Where a claimant does not assert that they meet a listing at the hearing, and is unable to demonstrate that they meet the listing by reference to the medical records, "the ALJ was therefore not obligated to discuss those specific listings." *See Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) ("Yet, neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'") (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013).

### 3.  Miscellaneous Arguments

Krull next asserts that the "ALJ has a duty to investigate the facts and develop the arguments both for and against granting benefits . . . . The ALJ never did so in this case." (Doc. 14 at 11). It is unclear whether Krull intends that this assertion bolster her listing argument, or if she intends this to be a separate argument entirely. Insofar as it might be interpreted as support for her listing argument, it is fatally flawed for the reasons described above, and this additional piece of argumentation cannot save it. Insofar as it might be

24

interpreted as a wholly separate argument, it is fatally underdeveloped and should be found

waived. *See Rice*, 169 F. App'x at 454.

Likewise, within the same section Krull asserts the following:

The ALJ's failure to give specific reasons and explain precisely how those reasons affected the weight accorded the opinions is a legal error requiring reversal. *See Rogers v. Commissioner*, 486 F.3d at 242-43. The ALJ failed to do so in this case. In *Varley v Secretary of HHS*, 820 F.2d, 777, 779 (6th Circuit 1987), the court stated that the RFC assessment must accurately portray the claimant's physical and mental impairments. The ALJ finds Plaintiff capable of work at the light exertional level. (R. 18, T.r. 18). Social Security definition of light work as:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. C.F.R. § 404.1567

As explained in 20 CFR 416.945 and SSR 96-8p, the assessment of residual functional capacity must reflect a function-by-function analysis of an individual's capabilities. The ALJ is required to discuss the limitations of the pain impairment which clearly ALJ Kim did not do in his decision. Again, the lack of analysis at step two of Plaintiff's severe impairments of bilateral hip problems and peripheral neuropathy impacts the Plaintiff's ability to perform light work on a sustained basis. Further, it is unclear how the Plaintiff could perform light work on a consistent basis considering she would need to lift up to 20 pounds, pushing and pulling, and reaching on a regular basis.

25

(Doc. 14 at 12-13). It not clear if Krull intends for this jumble of arguments to operate a single claim for remand, nor how these seemingly disparate arguments could work together as a whole.

Krull mentions the weight given by the ALJ to physician opinions generally, but she does not cite any particular physician whose opinion was not given weight, nor even an opinion which she feels was accorded with improper weight. Review of the ALJ's decision demonstrates that he specifically considered the weight that should be assigned to Drs. Marsh, Mesaros, Pestrue, Blum, Newhouse, and to Krull's friend Ms. Withey. (Tr. 23-24). Furthermore, it is not clear what relation the weight assigned to these opinions has to the other portions of Krull's argument. State agency physician Dr. Dale Blum found that Krull could lift twenty pounds occasionally and ten pounds frequently, and was limited in terms of pushing and or pulling with her right upper extremity. (Tr. 74). The ALJ gave this opinion great weight. (Tr. 24). Consistent with this opinion, the ALJ's RFC limited Krull to light work, which likewise requires lifting no more than twenty pounds, and frequent lifting of ten pounds (*see* 20 C.F.R. § 404.1567(b) and § 416.967(b)), and to only occasional pushing and pulling with the right upper extremity, with no reaching behind herself. (Tr. 18).

While Krull does not mention them, the ALJ noted that the only opinions in the record which suggested a lower level of lifting capacity were authored by Drs. Mesaros and Marsh. (Tr. 23). On March 25, 2015, Dr. Marsh limited Krull to "lift less than 10 lbs." (Tr. 472). Yet, as the ALJ noted, this restriction appears on a page entitled "post operative

26

instructions," and thus appears to be a temporary restriction imposed following surgery. (Tr. 23, 472). Likewise, Dr. Pestrue limited Krull to "no heavy lifting" on August 26, 2014, and that document included the phrase "problem: post-operative visit after Cataract Surgery") (Tr. 527-28). The ALJ gave these opinions little weight as they reflected short-lived restrictions following surgery, and did not accurately reflect Krull's overall physical condition outside of the context of her post-operative healing periods.

Next, while Krull is quite correct that the ALJ's RFC assessment must accurately account for the claimant's impairments, *see Varley*, 820 F.2d at 779, she has not provided any argument as to why the ALJ's RFC assessment falls short of this standard. She is incorrect in asserting that 20 C.F.R. § 404.1520a and SSR 96-8p requires a "function-by-function" analysis in the text of the ALJ's decision. *See Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 547 (6th Cir. 2002) ("Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.") (quotation omitted). An ALJ is not required to include in a plaintiff's RFC those limitations that he does not find credible, *see Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993), nor is the ALJ required to analyze functions for which no restriction has been alleged, *see Delgado*, 30 Fed. Appx. at 547. The ALJ must simply craft an RFC assessment which accurately reflects the claimant's limitations as demonstrated by the evidence. As discussed above, Krull has failed to demonstrate that her bilateral hip problems and peripheral neuropathy impose greater limitations on her

27

functioning than provided for in the ALJ's RFC finding. Krull has made no argument that the ALJ ought to have included any other limitations.

Insofar as Krull argues (in a single, conclusory sentence) that the ALJ failed to discuss the limitations imposed by pain, review of the ALJ's decision again demonstrates otherwise. (*See* Tr. 19 ("Stiffness and pain in her hip affects her ability to walk and sit."); Tr. 20 ("Norco for right shoulder pain.); Tr. 21 ("The claimant reported she was not on any pain management other than taking over-the-counter Tylenol, as needed, and ice therapy on her back and shoulder"); Tr. 22 ("The claimant reported that pain medication and lying down on a hard surface 'help' her back pain.")). The ALJ also explicitly considered Krull's statements in her function report and her friend's third-party function report. (Tr. 17, 23, 24). Krull has not pointed to any medical record or piece of subjective testimony which the ALJ failed to consider, nor any restrictions imposed by pain which the ALJ should have included in his RFC finding. No error can be found here.

Finally, Krull asserts that "it is unclear how the Plaintiff could perform light work on a consistent basis considering she would need to lift up to 20 pounds, pushing and pulling, and reaching on a regular basis." (Doc. 14 at 13). This argument (if it can be called an argument at all) is unquestionably waived. *See French v. Comm'r of Soc. Sec.*, No. 15-12687, 2016 WL 3951419, at *12 (E.D. Mich. June 30, 2016) ("Noting that some element of an ALJ's decision is "peculiar" is not a developed argument, if indeed it can be characterized as an argument at all."), report and recommendation adopted, No. 15-12687, 2016 WL 3924111 (E.D. Mich. July 21, 2016). That Krull finds some portion of the ALJ's

28

decision "unclear" is an invitation to craft an argument, *i.e.* "a coherent series of statements leading from a premise to a conclusion," not an argument in and of itself. *Argument*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/argument (last visited December 9, 2016). In any case, review of the ALJ's decision clearly demonstrates how the he reasonably concluded that Krull could perform a limited range of light work. (Tr. 18-26).

Krull also argues that the ALJ "never evaluates the claimant's subjective complaints in accordance with the disability regulations pertaining to evaluation of symptoms under SSR 96-7p." (Doc. 14 at 13). That ruling provided[1] that ALJs "must consider" the following factors when considering a claimant's statements:

> A non-exhaustive list of factors to be considered by the ALJ includes: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, the individual has received; (6) any measures the individual uses to relieve his or pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions.

SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996); see also 20 C.F.R. § 404.1529(c). Krull recognizes that the ALJ considered "very limited daily activities," but asserts that he failed "to explain how these would equate to sustaining light work." (Doc. 14 at 13). Yet even

---

[1] SSR 96-7p was superseded on March 28, 2016, by SSR 16-3p. There is no indication that SSR 16-3p has retroactive effect, thus SSR 96-7p controls the ALJ's decision in this case, which was rendered on October 21, 2015. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006)(accord 42 U.S.C. § 405(a))(The Social Security Act "does not generally give the SSA the power to promulgate retroactive regulations").

assuming that Krull's activities of daily living are inconsistent with light work, this factor is just one of the many to be considered in an ALJ's credibility assessment. The ALJ reasonably concluded, as discussed above, that Krull's medical record did not support a finding of greater disability than provided for in his RFC assessment. This analysis likewise disposes of Krull's assertion that "[t]he ALJ's RFC of light work failed to 'accurately portray the individual's physical and mental impairments' as required under *Varley*.

In any case, the ALJ expressly stated that he considered "all symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR 404.1529 and 4416.929 and SSRs 96-4p and 96-7p." (Tr. 18). Where an ALJ expressly states that they considered 96-7p, and "[t]here is no indication that the ALJ failed to do so," the claimant's argument under SSR 96-7p "lacks merit." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). Moreover, review of the ALJ's decision demonstrates that he explicitly discussed all of these factors insofar as they are relevant to Krull's testimony. (*See* Tr. 18-24). Krull's assertion that the ALJ "makes no attempt to evaluate the factors set forth in SSR 96-7p in his decision" is thus clearly without merit.

Krull also asserts that

The ALJ fails to point out any details on how he made any determination in this decision. The ALJ fails to follow up with any discussion. The ALJ makes no attempt to allow the reader a fair and unbiased account of the medical evidence and analysis. The ALJ provides no specific reasons or analysis for how he reached these limited conclusions. There is never a discussion of why or how the ALJ gave the RFC determination he gave. In short, there is no discussion, no rationale, and zero due process in the ALJ's decision.

(Doc. 14 at 13). These bald assertions cannot be categorized as arguments at all, and consequently provide no guidance to the Court as to what specific error Krull believes the ALJ perpetrated. Therefore, I find that they merit no further discussion. Alternatively, if these assertions are found to be arguments, they are clearly so skeletally developed as to merit waiver.

Krull next asserts that the ALJ was required to include a narrative discussion of how he reached his decision pursuant to SSR 96-8p, but that the ALJ "ALJ never complied or even attempted to reconcile Social Security Ruling 96-8p with his decision." (Doc. 14 at 13-14). In relevant part, that ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p. In this case, the ALJ spends approximately seven pages discussing in detail every pertinent detail of Krull's medical records, her subjective complaints, work history, her residual capacity to perform work, and the jobs available to a person so limited. (Tr. 18-24). Krull does not point to any portion of the narrative which is missing, but instead, one again, requests that the Court take it on faith that the decision is deficient. Even

31

assuming that this argument is sufficiently well developed to evade waiver, a brief glance at the ALJ's decision dispels Krull's assertion of deficiency.

Finally, Krull asserts that "[o]ne would be hard-pressed to find a position that Plaintiff could perform based on the ALJ's findings or the severe impairments which the ALJ failed to analyze." (Doc. 14 at 14). A review of the oral hearing and the ALJ's decision reveals that Krull retains the ability to perform work available in substantial numbers as a machine tender and office helper. (Tr. 25-26).

In sum, Krull's assertions of error are either so skeletally presented that they merit waiver, or fail on the merits. The ALJ's decision is supported by substantial evidence, and should be affirmed.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Krull's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Krull v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 21, 2016               S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 21, 2016                    By s/Kristen Castaneda
                                           Case Manager

34